UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| **Virginia Stirnweis,**<br><br>                            **Plaintiff,**<br><br>v.<br><br>**Capital One Services, LLC,**<br>**Capital One Financial Corporation, and**<br>**Capital One, National Association,**<br><br>                            **Defendants.** | CIVIL ACTION NO.  <u>3:20cv00989</u> |

**COMPLAINT**

Plaintiff Virginia Stirnweis ("Plaintiff" or "Stirnweis") respectfully moves for judgment against Defendants Capital One Services, LLC, Capital One Financial Corporation and Capital One, National Association, (collectively "Capital One" or "Defendants"):

**Introduction**

1.  This is a claim for relief pursuant to Older Workers Benefits Protection Act (OWBPA), and subject to this Court's ruling on the OWBPA claim, should Plaintiff prevail on such claim, then Plaintiff asserts a corresponding claim under the Age Discrimination in Employment Act (ADEA). Plaintiff was employed by Capital One, and upon her termination signed a "Letter of Agreement" purporting to release her claims under ADEA. Plaintiff alleges that she was terminated pursuant to an employment termination program and that the Letter of Agreement failed to comply with the OWBPA requirement of 45-day consideration period and a listing of names and job titles of others affected by the program.  Plaintiff is entitled to keep her

1

severance payment and sue Capital One for age discrimination. *Oubre v. Entergy Operations*, 522 U.S. 422 (1998).  Plaintiff may sue for an OWBPA violation. *Krane v. Capital One*, 314 F. Supp. 2d 589 (E.D.Va. 2004) (Payne, J.).  In conjunction with a Court determination that the Letter of Agreement did not comply with OWBPA and, conditioned on such finding, plaintiff seeks relief for age discrimination under ADEA.

2. Although Plaintiff intended to bring this as a collective action under 29 U.S.C. § 216(b), the Court's decision on June 8, 2020 in *Hutchens v. Capital One Services, LLC, et al.*, Case No. 19-cv-546 precludes such an action because the identical "Letter of Agreement" that Plaintiff signed was at issue in *Hutchens* for which this Court held that plaintiff could not proceed collectively. If this Court or a higher Court ultimately reverses the *Hutchens* holding and allows a collective action to proceed, then Plaintiff will join with the plaintiff in *Hutchens* and other similar cases in order to proceed collectively against Defendants, and Plaintiff reserves the right to amend this Complaint accordingly. (Stirnweis has a related action for FLSA violations pending against the same defendants, *Stirnweis v. Capital One*, Case No. 3:19-cv-637-MHL, which is a companion case to *Hutchens* for purposes of the collective action waiver issue).

## Jurisdiction and Venue

3. This Court has jurisdiction for his ADEA claims pursuant to 29 U.S.C. § 216(b) as incorporated by 29 U.S.C. § 626(b), and under 29 U.S.C. § 626(c), in that the Plaintiff may bring this action in any appropriate United States District Court.

4. Venue is proper for this Court pursuant to 28 U.S.C. § 1391 and Local Rule 3(B)(4) since the acts and omissions giving rise to this lawsuit have taken place in the Eastern District of Virginia.

5. Defendants are subject to personal jurisdiction in the Commonwealth of Virginia.

## Parties

6. Stirnweis is a resident of Virginia who was employed by Capital One most recently as a Senior Associate within the Insurance Risk Management division. Plaintiff was an "employee" as defined in the ADEA.

7. Capital One Services, LLC is a Virginia limited liability company, which has its principal office in Virginia.

8. Capital One Financial Corporation is a foreign corporation, which has its principal office in Virginia.

9. Capital One, National Association is a foreign corporation, which has its principal office in Virginia.

10. On information and belief, the Defendants are related entities in the financial products and services industry. According to filings with the Virginia State Corporation Commission, the Defendants list their principal office as being located at 1680 Capital One Drive, McLean, Virginia 22102 and share the same registered agent. Plaintiff is currently unable to determine the precise corporate structure and relationship between Defendants. Defendants are an "employer" as defined by the ADEA.

## Factual Allegations

11. Stirnweis was hired by Capital One in February 2009.

12. Stirnweis worked from Capital One's West Creek office complex in Goochland County, Virginia. When not working in person at Capital One's West Creek office, Stirnweis worked remotely from her home.

13. During the time frame relevant to this lawsuit, Stirnweis worked as a Senior Associate within Capital One's Insurance Risk Management department and was age 51.

**Performance Management**

14. Capital One has five categories for its performance evaluation ratings scale: Exceptional, Very Strong, Strong, Inconsistent, Action Required.

15. Capital One informally refers to the five categories as five "buckets."

16. During Stirnweis' employment with Capital One (age 41 to 51) she consistently received strong performance evaluations. In the five years prior to her termination (2012-2017), Stirnweis received an overall rating of "Strong" on all Year-End Performance Reviews and was rated as "Very Strong" on her final mid-year performance review prior to her termination.

**Policy to Increase "Involuntary Attrition"**

17. Capital One claims to hire the best and brightest associates available. For example, Chief Information Officer Rob Alexander stated in a blog post on July 19, 2017 that Capital One has a "best people philosophy," which involves hiring the "best talent in the industry."

18. During the relevant time period, Capital One implemented a policy that sought to increase Capital One's "involuntary attrition" rate of employees, that is, terminations based on alleged poor performance or job elimination.

19. In order to carry out Capital One's new policy to increase "involuntary attrition" it changed or implemented other personnel policies, including:

    a. Prohibiting employees rated "Inconsistent" from finding other roles within Capital One (the "No-Transfer" policy);

    b. Changing from a "performance management" distribution that was a "guide" or "aspirational" distribution (previously as low as 5% in the bottom two "buckets"), to a <u>mandatory</u> forced distribution;

4

   c. Changing the prior policy which only required a "coaching plan" or PIP for employees in the "Action Required" bucket, to now also requiring a coaching plan or PIP for all employees who are rated in the "Inconsistent" bucket.

  20. The No-Transfer policy that went into effect was that any employee rated "Inconsistent" was prohibited from transferring to another role within Capital One without special dispensation from a VP-level executive. Individual discretion of managers to accept transfers of employees rated "Inconsistent" was prohibited. Previously employees rated "Inconsistent" were allowed and encouraged to find other roles within Capital One, and the hiring managers had wide discretion to approve such transfers.

  21. The most significant change in Capital One policy was that it intentionally sought to increase its rate of "involuntary" terminations.

  22. Capital One tracks percentages of "involuntary" terminations, also known within Capital One as "involuntary attrition."

  23. At Capital One, "involuntary attrition" refers generally to terminations that are "involuntary" to the employee, namely (1) performance-based terminations, and (2) job eliminations (known within Capital One as "restructuring").

  24. Upon information and belief, Capital One required its managers to involuntarily terminate a set percentage of its employees across all business units.

  25. The policy requirement to meet specific "involuntary attrition" targets was set by the highest executives within Capital One.

  26. "Performance Management" was the primary means by which this central policy of increasing "involuntary attrition" rates was implemented.

  27. At Capital One the term "distribution" means the range of performance ratings set

for each "bucket" of performance. Previously the "distribution" percentages set for each "bucket" was aspirational. During the relevant time period of this lawsuit, Capital One's "distribution" percentages were mandatory.

28. This "Performance Management" policy of forcing managers to rank a fixed percentage of employees as poor performers was informally called "forced rankings" or "forced distribution" by Capital One employees.

29. Under the guise of "Performance Management," the Executive Committee (EC) members, (the highest echelon of executive leadership at Capital One), determined the specific forced "distribution" percentages for their managers to meet regarding what fixed percentage of employees were to end up in each of the performance "buckets" applicable to that EC's line of business.

30. From the bottom two "buckets," employees were placed on "coaching plans" or "performance improvement plans" ("PIPs").

31. Employees who, through "Performance Management" were forced into the bottom two buckets or placed on "coaching plans" and "PIPs," were the pool from which managers they would identify the ultimate target of "involuntary" terminations.

32. In addition to "Performance Management," Capital One engaged in some restructuring in the form of job eliminations which also counted towards its targeted increase of its "involuntary attrition" rate.

33. Elsewhere in the private sector, where an employer requires a set percentage of employees to be ranked as poor performers, this practice is commonly called "stack rankings." (See, e.g. Amazon to Drop Dreaded Stack-Ranking Performance Reviews, *Seattle Times*, Nov. 14, 2016; Microsoft Gets Rid of Stack-Ranking Review System, *Seattle Times*, Nov. 12, 2013).

34. The problem with stack rankings is that employees who are objectively meeting all performance expectations are falsely rated as poor performers.

35. Falsely giving good employees poor performance evaluations became Capital One's standard operating procedure under its "Performance Management" policy.

36. The Requirement that fixed percentage of employees be rated as poor performers, with a subset therein being terminated "involuntarily," led to objectively well-performing employees being issued poor performance evaluations, coaching plans, and PIPs, and ultimately terminated.

37. Although performance evaluations, coaching plans, PIPs, and terminations were issued directly to individual employees, it was all done as part of an overall policy implemented by Capital One to increase "involuntary attrition" rates across all lines of business.

38. Through "involuntary attrition" of current employees, Capital One was making room for younger employees pursuant to a marketing, recruiting, and hiring campaign to attract recent college graduates.

39. At the same time that Capital One was implementing stack rankings to increase the rate of "involuntary" terminations, it was engaging in a marketing, recruiting, and hiring campaign to attract recent college graduates to Capital One.

40. "Our No. 1 principle is to attract really talented people," [Capital One VP of Human Resources] Judy Pahren says. "We know our success is dependent on talent." Recruiting younger workers like millennials, she adds, "is key to that strategy." *See* Virginia Business Magazine, The Rise of Millennials, November 2019.[1]

41. Capital One's effort to higher younger workers came through its Campus

---

[1] Available at https://www.virginiabusiness.com/article/the-rise-of-the-millennials/ (last accessed Dec. 4, 2020).

Recruiting Program ("CRP"), which focused on hiring only recent college graduates.

42. Within the past two years the CRP has been open only to college graduates in classes 2017 to 2020. Based on the general age of college graduates between the years of 2017 and 2020, Capital One has essentially set its hiring criteria to candidates in their early to mid-20s.

43. Currently, Capital One's website makes clear that its "Full-Time Programs" in the CRP are limited only to college graduates from the classes of 2019 to 2021. (https://campus.capitalone.com, visited December 22, 2020). The website directs anyone who graduated before 2019 to apply for jobs to Capital One's main site, separate from the CRP programs:



(https://campus.capitalone.com/full-time-programs/, visited December 22, 2020) (red circle added, link redirecting to https://www.capitalonecareers.com/search-jobs).

44. In order to make room for the new CRP recruits in their early to mid-20's, Capital One intentionally increased its "involuntary attrition" rate, that is the rate at which employees are involuntarily terminated from their employment with Capital One.

45. In order to increase its "involuntary attrition" rate and to make room for new hires in their early to mid-20's through the CRP program, Capital One required its managers to engage in the forced distribution, stack rankings, and issuance of "coaching plans" and "PIPs," under the guise of "performance management" as set forth above.

46. Job eliminations, or "restructuring" of employees counted towards the distribution rates for purposes of enforcing Capital One's policy to increase involuntary attrition.

### Termination of Stirnweis

47. Although Stirnweis was hired by Capital One in 2009 at age 41, that was before it implemented its policy to increase "involuntary attrition" beginning in 2017.

48. Capital One's termination of Stirnweis did not arise out of individual circumstances. It was a result of Capital One's mandate requiring managers to increase "involuntary attrition."

49. In late 2017 and early 2018, the Insurance Risk Management Team that Stirnweis was on saw significant turnover.

50. In or about December 2017, Michelle Dixon (age 52) was terminated by Capital One.

51. In or about January 2018, Carl Miller (age 56) was terminated by Capital One.

52. In or about April 2018, George Pink (63) was also terminated by Capital One.

53. This left Stirnweis and Barbara Cattlett as the only two team members over the age of 50 on the Insurance Risk Management Team.

54. However, Ms. Cattlett held a lower position than Stirnweis, held less responsibility than Stirnweis and other team members, and had previously notified Capital One of her plans to retire in 2019.

55. Capital One repopulated the Risk Management Team vacancies with at least three younger associates in their 20's and 30's who were either new hires or internal transfers.

56. All of these individuals were much younger than Stirnweis and had significantly less "risk management" experience than her.

57. Accordingly, from approximately April 2018, when her former boss George Pink was terminated, until her termination in January 2019, Stirnweis was the only Senior Associate over the age of 50 on the Insurance Risk Management Team.

58. In or around the middle of October 2018, Stirnweis was verbally told by her supervisor that her position was being eliminated effective January 5, 2019.

59. On or about December 26th, Stirnweis received written notice of her termination and her Letter of Agreement from Capital One outlining the terms of her termination severance.

60. At the time of her alleged job elimination the reason Capital One gave to Stirnweis was job elimination.

61. At Capital One, a job elimination is called "Restructuring".

62. Stirnweis disputes the legitimacy of the reasons proffered by Capital for her termination.

63. Shortly after Stirnweis' termination in January 2019, Capital One posted an advertisement listing for a "Corporate Insurance Management" position, the same job that Stirnweis held and was told had been eliminated.

64. Such posting shows that Capital One's proffered reason of job elimination, or "restructuring" of Stirnweis's position, was merely pretext.

65. Upon information and belief, Capital One hired a much younger person than Stirnweis to perform replacement duties in the "Corporate Insurance Management" position.

66. Upon and information and belief, Capital One purported to select Stirnweis for job elimination in part because of poor performance or lack of knowledge in insurance or risk management. Such purported reason(s) are false.

67. Stirnweis was a strong performer at Capital One for many years and was the most experienced member on the Risk Management Team when she was discharged.

68. In the five years prior to her termination (2012-2017), Stirnweis received an overall rating of "Strong" on each Year-End Performance Review.

69. In July 2018, Stirnweis was rated as "Very Strong" on her mid-year performance review.

70. Capital One's process and policy of increasing involuntary attrition in the manner set forth herein (through "performance management" and job eliminations), is a facially neutral policy that has a disparate impact on employees over age 40 across all lines of business at Capital One.

71. Such policy is an employment termination program under the OWBPA that affects two or more employees.

72. Upon termination of Stirnweis, Defendants provided, and Stirnweis signed, a Letter of Agreement ("Agreement") which provided her severance pay in exchange for waiving certain claims against Defendants. Capital One has a copy of this Agreement which is substantially similar to the Agreement in *Hutchens v. Capital One*, Case No. 3:19-cv-546 (ECF No. 1-1).

73. The severance "Agreement" provided to Stirnweis under the Capital One Severance Plan was called the "Restructuring Benefit Structure," a far greater amount than the "Performance Benefit Structure" which Capital One gives to associates terminated for alleged

poor performance.

74. Upon termination of Stirnweis and other affected employees, Capital One failed to comply with the OWBPA requirement that affected employees be given 45 days to consider the release, and that ages and job titles of associates be provided.

75. Capital One did not provide 45 days, nor the statistical data of ages and job titles of other employees as required by OWBPA.

### Count 1 – OWBPA

76. OWBPA claims may not be released.

77. ADEA claims may not be released unless they comply with the OWBPA.

78. Capital One's Letter of Agreement did not comply with OWBPA.

79. The policy alleged herein was an "employment termination program" affecting two or more employees.

80. The Agreement provided to Plaintiff and others did not provide 45 days to consider the waiver of any rights or claims under the ADEA.

81. The Agreement provided to Plaintiff and others did not provide the job titles and ages of all individuals selected or not selected for termination under such policy alleged herein.

82. The Agreement was not a "knowing and voluntary" waiver of Plaintiff's rights and claims under the ADEA.

83. Plaintiff is entitled to declaratory, equitable, and/or injunctive relief based on Capital One's OWBPA violation including but not limited to: age and job title data across the applicable line(s) of business, data reflecting "involuntary attrition" rates, other statistical data relating to these claims; an order declaring Capital One in violation of OWBPA and permitting Plaintiff to proceed with his claim under the ADEA, without retaliation and without being in

breach of the Letter of Agreement; an award of attorneys' fees and costs; and other equitable, injunctive, and/or declaratory relief requested below.

84. The party asserting the validity of an OWBPA waiver has burden of proof that it was "knowing and voluntary." 29 USC § 626(f)(3).

85. Capital One cannot prove that the Agreement was knowing and voluntary.

## Count 2 – ADEA

86. Capital One discriminated against Stirnweis because of her age, 51.

87. Capital One characterized Stirnweis' termination as a part of a "restructuring."

88. The characterization is pretextual and false because Capital One posted for Stirnweis's job shortly after her termination.

89. But for Stirnweis' age, she would not have been selected for termination from employment.

90. Capital One disparately treated Stirnweis and other older associates, and treated younger employees more favorably, in the forced ranking, terminations, and/or job eliminations of older employees.

91. Capital One's disparate treatment of Plaintiff and older employees was willful.

92. Capital One's policies also had a disparate impact on older employees. Specifically, Capital One engaged in an official policy to increase the rate and percentage of "involuntary attrition," which it carried out in two ways: "performance management" terminations and "restructuring" terminations. This policy had a disparate impact on Capital One employees over age 40. The average age of Capital One employees was reduced as older employees were replaced, in "headcount," by newer hires, many of whom were in their early to mid-20's including CRP hires.

93. Stirnweis was disparately impacted because of her age by Capital One's policies which resulted in her termination.

94. Capital One implemented such discriminatory policy willfully, or showed reckless disregard for the rights of Capital One's employees over 40.

### Relief Requested for OWBPA

Wherefore, Plaintiff requests the Court grant the following Relief:

A. Issuance of an Order finding that Capital One did not comply with the OWBPA;

B. Declaring that Capital One's policy, as alleged herein, was an "employment termination program" under OWBPA;

C. Declaring that the "Letter of Agreement" does not comply with the OWBPA, that the waiver contained therein was not "knowing and voluntary," and that Plaintiff may proceed with his ADEA claim;

D. An Order directing Capital One to comply with OWBPA, including producing the ages and job titles of employees who were selected and /or non-selected for termination under the policy alleged herein, which should have produced under OWBPA;

E. An Order directing that notice be delivered to all Capital One employees involuntarily terminated under the policy alleged herein, who signed a Letter of Agreement, informing them that their waivers are invalid and that those employees may have ADEA claims;

F. attorneys' fees; and

G. any and all further relief permissible by law.

## **ADEA Relief Requested**

Wherefore, Plaintiff requests the following Relief against Defendants:

      A.     Court order requiring Capital One to provide statistical data relating to employees and ages, involuntary attrition rates, headcount, performance management calibrations, forced rankings, involuntary terminations, new hires, and any other employment data relevant to Plaintiff's disparate impact claim;

      B.     money damages suffered by Plaintiff as a result of Capital One's age discrimination of Plaintiff, including but not limited to lost pay, benefits, and if the Plaintiff received Capital One's "Performance Benefit Structure" severance, then the difference in severance benefits between that which Plaintiff received, and the greater sum of the "Restructuring Benefit Structure" which Plaintiff should have received as a result of the policy alleged herein;

      C.     liquidated damages in an amount equal to all money damages suffered by Plaintiff as a result of Capital One's willful violation of the ADEA;

      D.     pre-judgment and post-judgment interest;

      E.     reasonable attorney's fees and costs expended in the prosecution of this case;

      F.     any and all further relief permissible by law.

Plaintiff respectfully demands **TRIAL BY JURY** for all factual questions at issue in this case.

Respectfully submitted,
**Virginia Stirnweis**
Plaintiff


By:\_\_\_\_/s/_____
      Craig Juraj Curwood (VSB No. 43975)
      Curwood Law Firm, PLC
      530 E. Main Street, Suite 710
      Richmond, VA 23219
      Telephone: (804) 788-0808
      Fax: (804) 767-6777
      Email: ccurwood@curwoodlaw.com

      and

      Harris D. Butler, III (VSB No. 26483)
      Paul M. Falabella (VSB No. 81199)
      BUTLER ROYALS, PLC
      140 Virginia Street, Suite 302
      Richmond, Virginia 23219
      Telephone: (804) 648-4848
      Facsimile: (804) 237-0413
      Email: harris.butler@butlerroyals.com
      paul.falabella@butlerroyals.com

      *Attorneys for Plaintiff*